IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH D. WAGNER, SR., | ) | CASE NO. 3:17CV1616 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| WARDEN CHARLES BRADLEY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Joseph Wagner, Sr., ("Petitioner" or "Wagner") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  Doc. 1, 4.  Wagner is detained at the Pickaway Correctional Institution, having been found guilty by an Erie County, Ohio, Court of Common Pleas jury of ten counts of rape against two minor victims.  *State v. Wagner*, Case No. 2013-CR-164 (Erie Cty. Common Pleas Ct., filed June 25, 2014).  At sentencing, the trial court sentenced him to eleven years in prison on one count and life in prison without parole on the nine remaining counts; the sentences on the five counts involving each victim to run concurrently but consecutively to the sentences on the counts involving the other victim; classified him as a Tier III sex offender; and ordered him to pay restitution.  Doc. 8-1, pp. 112-116; Doc. 8-8, pp. 37-38.

On August 21, 2017, Wagner filed an Amended Petition for Writ of Habeas Corpus setting forth three grounds for relief.[1]  Doc. 4.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  As set forth more fully below, Wagner's grounds are procedurally defaulted, fail on the merits, and/or are not cognizable.  Thus, the undersigned recommends that Wagner's Petition for Writ of Habeas

---

[1] Wagner's initial Petitioner was filed on August 1, 2017.  Doc. 1.

Corpus be **DISMISSED in part** and **DENIED in part**.[2]

## I.  Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

The following summary of underlying facts is taken from the opinion of the Erie County Court of Appeals, Sixth Appellate District of Ohio:

> {¶ 2} In February of 2013, ten-year-old L.M. and seven-year-old J.M. reported to their mother, T.M., that their grandfather, Joseph D. Wagner, Sr., had been inappropriately touching them over an approximately three-year period. On April 10, 2013, Wagner was indicted on 10 counts of rape, violations of R.C. 2907.02(A)(1)(b). As to all counts, Wagner was alleged to have purposely compelled the victims to submit to sexual conduct by force or threat of force, and as to all counts except Count 5, the victims were alleged to have been under the age of ten.

> *      *      *

> {¶ 15} At trial, both L.M. and J.M. testified. So did a number of individuals who tended to them after the abuse was reported, including Rebecca Boger, an intake investigator in the Children's Services Division of the Ohio Department of Job and Family Services ("ODJFS"); Jacqueline Spadaro, a mental health therapist at Bayshore Counseling Services, who counseled L.M.; Rebecca Dills, a mental health therapist at Bayshore Counseling Services, who counseled J.M.; Melinda Kuebler, a sexual assault nurse examiner ("SANE") who examined L.M. and J.M.; and Corey Mook, an officer with the Sandusky police department. The girls' parents also testified. Some of these witnesses testified about statements the victims made to them.

> *      *      *

> {¶ 27} Boger testified that as an intake investigator, her job is to investigate allegations of abuse or neglect, to ensure that the child is safe, and then to refer the family for any services they may need. Boger interviewed L.M. and J.M. at Michael's House on February 13, 2013. Michael's House is a child advocacy center that was developed in 2005. Boger described it as a neutral, comfortable place to interview children "so they don't have to go to the police department or to our agency." Michael's House has audio and video recording capabilities. Boger recorded her interviews of L.M. and J.M.

---

[2]  The grounds in the petition that are procedurally defaulted and not cognizable results in a dismissal; the grounds in the petition that are addressed on the merits results in a denial.

{¶ 28} Boger characterized her interview of L.M. and J.M. as "forensic." She testified that she conducts her interviews in accordance with Beyond the Silence protocol developed by the state of Ohio. She said that she was trained not to use suggestive techniques or to ask leading questions and that she tries to get correct information in as non-traumatic a way as possible. Boger explained that she receives a case when someone calls the agency with a concern. What she does next is determined on a case-by-case basis. With some children, the child is at immediate risk of harm and it is her job to make sure that the child is safe from the perpetrator. Once she deems that the child is safe, if it is a criminal matter, her job is to contact law enforcement so they can assist in the case.

{¶ 29} Boger interviewed L.M. and J.M. separately with no one else present in the room. Before the interview, Boger had been told that there were allegations of inappropriate touching, but she said that the girls disclosed "much, much more than that" and that the girls' parents had not known the extent of what was revealed during their interviews. Boger referred the family to the NORD Center in Lorain so the girls could be examined by a SANE nurse.

{¶ 30} Boger responded to questions on cross-examination about the difference between a forensic interview and a therapeutic interview. She agreed that in a forensic interview, she tries to obtain as much information as she can about what may have occurred, and she attempts to do so in a neutral manner without influencing the statement. In a therapeutic interview, the interviewer takes the position that what has been reported is true and works to treat the patient.

{¶ 31} On cross-examination, defense counsel asked Boger specific questions about what L.M. and J.M. told her. In response to these questions, Boger testified that J.M. told her that Wagner scratched her, that J.M. didn't talk to L.M. about what happened, that Wagner made her bleed, that Wagner abused her every time she went over to his house, and that Wagner told her not to tell anyone but she told because she wanted to make the right choice. Defense counsel elicited from Boger that L.M. never told her she had been forced to perform oral sex or that Wagner had stuck his finger inside of her. She confirmed that L.M. had told her that Wagner stuck his penis inside of her, that it happened every time she stayed the night at her grandparents' house except for the last time, and that when it happened, Wagner was on top of her.

*     *     *

{¶ 34} Spadaro and Dills are licensed mental health therapists who diagnose and treat mental and emotional disorders. Spadaro treated L.M. and Dills treated J.M. They spoke at length about their diagnoses of the girls and the factors they considered in arriving at their diagnoses. This included many references to details that the girls provided during their therapy sessions.

{¶ 35} For instance, Spadaro testified that L.M. told her that the abuse began when she was around age seven, occurred mostly at her grandfather's house, and happened every time she went over to her grandparents' house. L.M. told Spadaro that her grandfather

would lock the door. She said neither of them had pants on, their private parts would touch, and sometimes his penis would go inside of her. She described that it hurt and he did not care because he did not stop. L.M. told Spadaro that after Wagner had sex with her, they would watch the movie "Goonies." She said that she had put her mouth on his penis and touched it with her hands. L.M. told Spadaro that her grandfather showed her pictures of naked girls on a stage. He told her he wanted to stick his penis in her vagina and would tell her that his penis missed her. L.M. said that her grandfather told her that if she had sex with him, he would give her tootsie rolls. She said she was scared and that her grandfather "squished" her by lying on top of her.

{¶ 36} L.M. told Spadaro about feelings of anxiety and fears of being judged by others. Spadaro described that L.M. would plug her ears if her sister talked about the abuse, she avoided her favorite movie because it made her think of her grandfather, and she did not like when her friends talked about their grandparents. Spadaro said that L.M. had flashbacks during the day, she experienced trouble sleeping at night, and she had angry outbursts.

{¶ 37} As part of her therapy, L.M. wrote a letter to her grandfather: "I remember you had sex with me and you hurt my private parts. I want to know why you touched me in the first place, among other things." She did not want to send the letter or share it with her parents.

{¶ 38} Spadaro confirmed that she conducted therapeutic interviews of L.M. and not forensic interviews. She said that based on her assessment of L.M., L.M. had been sexually abused and suffers from post-traumatic stress disorder.

{¶ 39} Dills testified that J.M. identified her abuser as "Papa." J.M. described to Dills that her grandfather yelled at her and told her to get into his bed. She said that he touched her in her lower parts, where her bathing suit would cover. J.M. explained that he would tell her to lie back when he touched her and if she did not, he would push her forehead back. J.M. said that once her grandfather kicked her and she kicked him back. When the abuse happened, her grandfather would lock the door. She wanted to run out, but did not want to hurt his feelings. J.M. said that her grandfather told her "it was the best stuff in the world" and told her not to tell a counselor or he would go to jail. J.M. finally told her parents because she did not feel good about it. J.M. told Dills that she did not want to think about it and did not want her to even say the name "Papa," and she questioned whether she had done the right thing telling her mother. They discussed how J.M. had told her sister before telling her mother.

{¶ 40} J.M. told Dills that she knew that Dills, her mom, and her dad believed her, but was sad because her grandmother did not believe her. She said that she could not talk to her sister because her sister does not want to talk about it. J.M. wanted her mom in the room during her session with Dills, but her mom asked to leave the room.

{¶ 41} Dills testified that based on her counseling of J.M., she would classify her as a child who has been sexually abused. Dills originally diagnosed J.M. with adjustment disorder with depressed mood. Eventually, Dills identified that J.M. suffers from PTSD.

4

She described that when she first started treating J.M., she complained of stomach pains and headaches. She was crying at school and was having a hard time focusing. She was getting up in the middle of the night, having nightmares and thinking she saw her grandfather. She was wetting the bed.

*      *      *

{¶ 43} Kuebler is a certified sexual assault nurse examiner. She testified that she was the program manager for the sexual assault unit at NORD Center, an outpatient mental health facility. She described that victims of sexual assault come to the NORD Center for forensic medical evaluations and rape kits. She discussed the protocol they follow. Typically, they begin by getting demographic and contact information from the person who has brought the child there. They then talk with the child, usually with the SANE and the child advocate present, to ask questions and find out from the child why they are there. They ask the child whether they would like to have their parent or guardian present for the exam, and if they do, they bring the parent or guardian back in.

{¶ 44} The examination is a head-to-toe physical looking at all areas of the body, noting any injury and inquiring about the origin of the injury. They then examine the genitalia. The exam takes two-to-three hours from start to finish. If the child has made any statements, they pass that information along to law enforcement.

{¶ 45} Kuebler testified that on February 13, 2013, she met with L.M. and J.M. J.M. told Kuebler that her grandpa used his nails and fingers on her front and back. She said that she was not supposed to tell anyone, but it started hurting and she did not want to hurt any longer. J.M. refused to allow Kuebler to perform an examination. She said it had been awhile since she had seen her grandpa and she did not need to be looked at.

{¶ 46} L.M. told Kuebler that her grandfather started inappropriately touching her when she was seven years old. She told Kuebler that it hurt. She said it did not bleed but he put his front part in her front part and back part and he used his hands. L.M. told Kuebler she wanted him to stop. Kuebler performed a head-to-toe forensic medical exam on L.M. which included a vaginal exam and exam of her rectal area. She found no evidence of trauma. Kuebler determined that L.M.'s hymen was intact. She explained that it is not unusual for a sexual abuse victim's hymen to remain intact. The hymen does not cover the vagina and it can remain intact despite penetration. She did not perform a rape kit on L.M. because it had been three or four weeks since she last saw her grandfather.

{¶ 47} Kuebler referred to her exam as a "forensic medical examination," however she said that the information she obtains from the victims prior to the examination is strictly for medical purposes and that it assists her in performing her medical examination.

*      *      *

{¶ 49} Mook is an officer with the City of Sandusky Police Department. On February 11, 2013, he responded to the call from M.M. and T.M. reporting the abuse. He went to their home. He spoke with M.M. and T.M. first, then spoke individually with each of the girls

5

with their parents present. He told them he heard there were some things that happened at their grandfather's house. The girls told him he had been touching them inappropriately. He asked J.M. where her grandfather had touched her and she pointed to her vaginal area. He asked how long it had been going on and she said it had been quite some time. He did not ask more specific questions. During his conversation with L.M., she indicated that her grandfather had touched both her vaginal area and her buttocks. He asked how long it had been happening, but does not remember the specific time frame other than that it had been going on for a while. The conversation lasted five to ten minutes and he did not ask for specific details.

*     *     *

{¶ 51} T.M. testified that on February 9, 2013, J.M. told her: "I have to tell you something. * * * Your papa has been doing this to me * * *." T.M. asked her if she had told anyone else and she said she had told L.M., and that L.M. told her he had been doing the same thing to her. T.M. approached L.M. and L.M. confirmed that her grandfather had been touching her. When T.M. asked where, L.M. pointed to "her front privates" and "her bottom."

{¶ 52} T.M. told her husband, M.M. T.M. and M.M. sat down with the girls and told them that the situation was very important and very serious. They asked the girls if they were sure they were telling the truth and they both said yes. T.M. and M.M. did not ask for any additional details.

{¶ 53} M.M. called the Sandusky police. When the officers came, one of them talked to the girls. He did not ask very many questions. They determined it was the wrong jurisdiction and they needed to call the Erie County sheriff. The sheriff's office sent an officer over to talk to the girls. An interview was set up with ODJFS on February 13, 2013. Each child was interviewed separately by Boger. T.M. said that she did not know what the girls were going to say because she did not ask them any details—she said she did not want to know. After the interview, Boger came out to talk to them and she said it was worse than they thought. She said Wagner would make L.M. watch sex tapes then make her do what they saw in the tapes, which included having sex with her. This was the first time T.M. or M.M. had heard this.

{¶ 54} T.M. testified that she is the one who washes the kids' clothes, but she never saw blood on her daughters' underwear or anything unusual on their clothing. T.M. said she had taken the girls to her parents' house on February 9, 2013, to give her dad a birthday gift. J.M. was holding her stomach saying she did not feel good. Wagner also said he did not feel well and did not want to get the kids sick, so they just dropped off the present and she took the kids home. The girls did not go in the house.

*State v. Wagner*, 57 N.E.3d 109, 113-123 (Oh. Ct. App. 2015).

### A. Trial Court

On April 10, 2013, an Erie County grand jury charged Wagner with 10 counts of rape in violation of Ohio Rev. Code § 2907.02(A)(1)(b). Doc. 8-1, pp. 5-8. The first five counts alleged rape of victim L.M. from April 2011 through February 2013 and the next five counts alleged rape of victim J.M. from July 2012 through February 2013. Doc. 8-1, pp. 5-7. The indictment charged Wagner with purposely compelling the victims to submit to sexual conduct by force or threat of force and all counts, except count 5, alleged that the victims were under the age of ten. Doc. 8-1, pp. 5-7.

Wagner, through counsel, filed a motion to dismiss the indictment based on insufficient information; the trial court denied it because the state had provided a bill of particulars. Doc. 8-1, pp. 18-22, 59. The trial court conducted competency hearings with respect to both minor victims and found them competent to testify at trial. Doc. 8-1, p. 60. Wagner, through counsel, filed a Notice of filing an expert witness report of Dr. Kamala London; the state objected, and the court ruled that Dr. London could testify as an expert witness for the defense as to proper protocol and interviewing techniques for child victims, but could not testify as to the veracity of the child victims or whether or not the abuse occurred. Doc. 8-1, pp. 61, 103. Wagner, through counsel, requested a court-ordered competency exam; the court ordered a psychological examination and, based on that examination, found Wagner competent to stand trial. Doc. 8-1, pp. 104, 107.

The case proceeded to trial. The jury found Wagner guilty on all charges and specifications. Doc. 8-1, pp. 109-110. On June 23, 2014, the trial court sentenced Wagner to eleven years in prison on one count[3] and life in prison without parole on the nine remaining counts; the sentences on the five counts involving each victim to run concurrently but consecutively to the sentences on the counts involving the other victim; classified him as a Tier

---

[3] Wagner was sentenced to eleven years on count 5, the only count that did not include a specification that the victim was under the age of ten. Doc. 8-1, p. 7.

III sex offender; and ordered him to pay restitution.  Doc. 8-1, pp. 112-116; Doc. 8-8, pp. 37-38.

### B. Direct Appeal

On July 24, 2014, Wagner, through new counsel, appealed to the Ohio Court of Appeals, Sixth District, raising the following assignments of error:

1. The trial court erred and abused its discretion by finding alleged victim J.M. competent to testify.

2. The trial court erred by admitting hearsay statements which caused defendant irreparable prejudice.

3. The convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

4. Prosecutorial misconduct deprived appellant of due process and a fair trial.

5. Cumulative error deprived appellant of due process and a fair trial.

6. The trial court erred in imposing restitution.

Doc. 8-1, pp. 117, 128, 133.  On December 30, 2015, the Ohio Court of Appeals affirmed the convictions but ordered a reduction in the restitution amount.  Doc. 8-1, pp. 261-301.  On May 17, 2016, the trial court issued a new entry reducing restitution.  Doc. 8-1, p. 404.

On January 7, 2016, Wagner, though counsel, filed a motion with the Ohio Court of Appeals to certify a conflict with the Ohio Supreme Court, arguing that its decision in his case regarding the admissibility of the victims' statements to medical professionals conflicted with two Ohio Court of Appeals' decisions in two other districts, the Eighth and Twelfth Districts. Doc. 8-1, pp. 302-205.  On February 19, the Ohio Court of Appeals found that its decision was not in conflict with the cases cited by Wagner and denied his motion to certify a conflict.  Doc. 8-1, pp. 312-317.

On February 16, 2016, Wagner, through counsel, appealed to the Ohio Supreme Court, asserting the following propositions of law:

1. Evid.R. 803(4) bars from admission a victim's hearsay statements given for forensic or investigative purposes. Therefore, each hearsay statement in a dual-purpose interview must be individually examined for its purpose.

2. Convictions for multiple counts of rape are unsupported by sufficient evidence where the victim does not testify to a corresponding number of separate and distinct instances of sexual conduct.

3. Where the prosecutor repeatedly ignores judicial instructions for questioning witnesses, is admonished in closing argument, and repeatedly introduces prejudicial information, pervasive prosecutorial misconduct deprives the defendant of a fair trial in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and in violation of the Ohio Constitution, Article I, Sections 10 and 16.

Doc. 8-1, pp. 318-321.  On May 4, 2016, the Ohio Supreme Court declined jurisdiction.  Doc. 8-1, p. 403.

### C. Federal Habeas Petition

On August 21, 2017, Wagner, through counsel, filed an Amended Petition for a Writ of Habeas Corpus.  Doc. 4.  He listed the following grounds for relief:

**Ground One**: [N]umerous instances of egregious prosecutorial misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.

**Ground Two**: [T]he trial court improperly admitted prejudicial hearsay by allowing the state to have witnesses to testify as to the child victim's statements when those statements were hearsay and contradicted the victim's own testimony in violation of his right to due process of law.

**Ground Three**: Petitioner's convictions were against the manifest weight of the evidence and that he is actually innocent.

Doc. 4, p. 4.  On November 6, 2018, Respondent filed a Return of Writ (Doc. 8), and Wagner filed a Traverse on April 6, 2019 (Doc. 12).

### II. Standard of Review under AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and

exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies when state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies.  *Williams*, 460 F.3d at 806.

**Exhaustion.**  A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).

**Procedural Default.**  Procedural default may occur in two ways.  *Williams*, 460 F.3d at 806.  First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id*.  In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted."  *Id*.  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

**Merits Review.**  In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause). *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.  "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principals and standards flowing from Supreme Court precedent. *Id*. at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005).  If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary

to, or unreasonably applied, Supreme Court precedent or clearly established federal law.  *White v. Woodall*, 572 U.S. 415, 426 (2014); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard.  *Williams*, 529 U.S. at 409.  "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011).  "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

#### A. A portion of Ground 1 is procedurally defaulted and the remainder fails on the merits

In Ground 1, Wagner argues that numerous instances of prosecutorial misconduct infected his trial with unfairness such that his due process rights were violated.  Doc. 4, p. 6.  He lists 10 instances of prosecutorial misconduct, nine of which occurred during closing argument, and also complains that the prosecutor asked leading questions.  Doc. 4, pp. 6-9.

##### 1. Eight of ten alleged instances of prosecutorial misconduct are procedurally defaulted

Eight of the ten alleged instances of prosecutorial misconduct listed in Wagner's Amended Petition, all of which occurred during closing argument, are procedurally defaulted because Wagner did not raise them on appeal to the Ohio Supreme Court.  The ten items he lists are:

1. The prosecutor, during closing argument, discussing safeguards against false accusations;

2. The prosecutor, during closing argument, vouching for the credibility of state witnesses: "You have to believe who you feel you need to believe. You heard the testimony. But the State's witnesses are credible.";

3. The prosecutor, during closing argument, telling the jury to "throw out" defense witness testimony;

4. The prosecutor, during closing argument, calling Wagner a liar and impugning his credibility;

5. The prosecutor, during closing argument, personalizing issues and telling the jury to come back with guilty verdicts;

6. The prosecutor, during closing argument, commenting, "somebody has to stand up for those children.";

7. The prosecutor, during closing argument, impugning Wagner's attorney and the defense;

8. The prosecutor, during closing argument, asserting that Wagner's defense witnesses colluded and that their testimony was scripted;

9. The prosecutor, during closing argument and cross examination, discussing facts not in evidence or evidence that was or should have been excluded [citing transcript pages of closing argument];

10. The prosecutor intentionally made the jury aware of the fact that Wagner was in jail.

Doc. 4, pp. 6-9.

Of the ten items listed above, the only issues that Wagner raised in his brief in support of jurisdiction to the Ohio Supreme Court were that the prosecutor, during closing argument, discussed safeguards against false accusations (item 1) and made the jury aware that Wagner was in jail (item 10).  Doc. 8-1, pp. 336, 338 (Wagner's brief in support of jurisdiction).  Wagner's failure to raise items 2-9 listed above to the Ohio Supreme Court results in the procedural default of those claims.  *See Williams*, 460 F.3d at 806 (a claim is procedurally default when a petitioner fails to pursue that claim through the state's ordinary appellate review procedures); *Williams v.*

*Mitchell*, 792, F.3d 606, 613 (6th Cir. 2015) (petitioner must present his claim to the Ohio Court of Appeals and the Ohio Supreme Court).  In his Traverse, Wagner admits that "each and every instance of prosecutorial misconduct may not have been set forth in his state claim," but submits, "there is no requirement that they be identical."  Doc. 12, p. 3.  He asserts that the "theory" of prosecutorial misconduct was raised and that his state claims "corresponds" with his federal claims.  Doc. 12, p. 3.  The undersigned disagrees; Wagner is required to present both the factual and legal underpinnings of his claims to the state courts.  *See id.* at 614-615;  *McMeans*, 228 F.3d at 681 ("General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated.");  *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) (when a petitioner uses very broad terms to describe his claim, the court must look to the factual allegations supporting the claim).

To overcome the procedural bar, Wagner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law.  He does not allege cause to excuse his procedural default.  *See Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) ("Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced.").  Moreover, even if Wagner alleged ineffective assistance of appellate counsel, that cannot constitute cause to excuse his procedural default because there is no constitutional right to an attorney on a discretionary appeal to the Ohio Supreme Court. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further.");  *Smith*, 463 F.3d at 432 ("There can be a constitutional claim of ineffective assistance of counsel only at a stage of the proceedings when there is a right to counsel under the Sixth Amendment," citing *Coleman*, 501 U.S. at 752); *Hale v. Burt*, 645

15

Fed. App'x 409, 417 (6th Cir. 2016) (no right to counsel on discretionary appeal to the state supreme court).

Wagner does not show a fundamental miscarriage of justice if the claims are not considered, *Coleman*, 501 U.S. at 750.  To do so he must show that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  A claim of actual innocence "requires the petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).  Wagner concedes he has no such evidence.  Doc. 4, p. 25.

In sum, a portion of Ground 1—items 2 through 9 of the listed complaints of prosecutorial misconduct at trial—is procedurally defaulted.

### 2. Alternatively, listed item 9 fails on the merits

Although Wagner describes item 9 as the prosecutor's statements during closing argument and on cross examination, he only cites to statements made during closing argument and the related transcript pages.  Doc. 4, pp. 8-9.  He does not identify or cite statements made during cross examination.  On appeal to the Ohio Supreme Court, Wagner only identified some of the statements described in item 9 in support of his argument of prosecutorial misconduct with respect to the state's cross examination of Wagner's wife.  Doc. 8-1, p. 335.  In other words, some of the complained of statements listed in Wagner's Amended Petition were not submitted to the Ohio Supreme Court (and are therefore procedurally defaulted), or they were not submitted to the Ohio Supreme Court in support of the argument he cited them for in this Court (and are therefore procedurally defaulted).

To the extent the Court generously construes the Amended Petition and considers the statements complained of in item 9 of the Amended Petition not to be procedurally defaulted, Wagner's claim fails on the merits.  Wagner contends that the prosecutor's closing argument included facts not in evidence or that ought to have been excluded.  Doc. 4, pp. 8-9 (listing six statements).  However, the Ohio Court of Appeals found that the testimony at trial supported the statements made by the prosecutor.  *Wagner*, 57 N.E.3d at 127, ¶77; at 128, ¶80.  Wagner does not demonstrate by clear and convincing evidence that the Ohio Court of Appeals' finding was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (petitioner bears the burden of rebutting the state's factual findings by clear and convincing evidence).  The Ohio Court of Appeals' determination was not unreasonable.  See also, e.g., Doc. 8-3, p. 194; Doc. 8-4, pp. 24, 32-33, 244; Doc. 8-5, pp. 13-14, 150 (trial transcripts of testimony that supports the complained-of statements of the prosecutor during closing argument).  To the extent Wagner argues that some or all of this testimony was or ought to have been excluded (Doc. 4, p. 8), his argument fails for the reasons explained in the balance of this opinion regarding Wagner's challenges to the trial court's evidentiary rulings and the prosecutor's leading questions.[4]

### 3. The remaining listed issues, items 1 and 10, fail on the merits

Wagner's remaining issues, items 1 and 10, fail on the merits.

### a. Item 1: prosecutor's statements during closing argument

A prosecutor's improper comments violate the United States Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[I]t is not enough that the prosecutor's remarks were undesirable or even

---

[4] The transcripts do not support Wagner's claim that any of the complained-of testimony was excluded.

universally condemned." *Id*.  The *Darden* standard is a very general one, "leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In item 1, Wagner argues that the prosecutor committed misconduct during closing argument when she indicated that she could identify false accusations and that she would not bring a case based on false accusations.  Doc. 4, pp. 6-7.  The prosecutor made the following statements during closing argument, in response to Wagner's counsel's closing argument (in which defense counsel indicated that Wagner had been falsely accused and the victims' father, motivated by money, had put them up to it):

> Defense counsel is picking its straws. This never happened, but if it did, and the whole time they're talking about a will. They're talking about money. They're talking about everybody implanting this in the kids' heads. You know, we didn't walk in here the day that we went to see the police on February 20th. He was not charged then with these offenses. An investigation took place afterwards. Everything's taken into consideration, the interviews, the counseling records, and then it's presented. There's safeguards to prevent falsely accused people, and some of the safeguards is the interviewing process. Some of the safeguards are the counselors. Some of the safeguards are the prosecutor talking to these kids.

> Defendant infers that I'm—I must be dumb, because it came—it was very evident that I talked to these girls, that I wouldn't see if they were falsely accusing somebody? That I would not see, by reviewing all the records and everything that was put before me, that I, myself, would bring a falsely accused person in this Courtroom? No, that's not going to happen and it didn't happen in this case.

Doc. 4, pp. 6-7; Doc. 8-7, pp. 153-154.

The Ohio Court of Appeals considered Wagner's claim:

> {¶ 59} To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was improper and prejudicially affected the defendant's substantial rights. *State v. Walker*, 1st Dist. Hamilton No. C–060910, 2007-Ohio-6337, 2007 WL 4208710, ¶ 45. "[A] reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, ¶ 50 (6th Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). "Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and

whether the evidence of guilt was overwhelming." *State v. Oviedo*, 6th Dist. Lucas No.
L–95–287, 1997 WL 525087, *2 (Aug. 15, 1997), citing *State v. Keenan*, 66 Ohio St.3d
402, 410, 613 N.E.2d 203 (1993).

*       *       *

{¶ 78} Defense counsel objected [to the prosecutor's remarks] and the trial court struck
these statements, but Wagner claims the damage was done because the jury heard them.

{¶ 79} "Generally, prosecutors are entitled to considerable latitude in opening and
closing arguments." *Boles*, 6th Dist. Lucas No. L–07–1255, 2009-Ohio-512, 2009 WL
282720, at ¶ 47, citing *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996).
During closing, a prosecutor may comment on what the evidence has shown and what
reasonable inferences may be drawn from the evidence. *Id.* "Isolated incidents of
prosecutorial misconduct are harmless, thus the closing argument must be viewed in its
entirety to determine whether the defendant has been prejudiced." *Id.*, citing *State v.
Stevens*, 2d Dist. Montgomery No. 19572, 2003-Ohio-6249, 2003 WL 22764527.

{¶ 80} Clearly, the argument of the state's attorney insisting that she can identify a false
accusation and denying that she would bring a falsely accused person to trial went well
beyond appropriate argument. However, the inappropriate comment was swiftly objected
to and stricken. The jury is presumed to follow the trial court's instructions, including any
curative instructions. *State v. Tibbetts*, 92 Ohio St.3d 146, 170, 749 N.E.2d 226 (2001).
As for the other purported misconduct of which Wagner complains, the testimony
supported the statements made by the prosecutor.

{¶ 81} We find Wagner's fourth assignment of error not well-taken.

*Wagner*, 57 N.E.3d at 127-128.

The prosecutor's comments in Wagner's case, in essence, amount to the prosecutor

vouching for the credibility of the state's witnesses.  In *Byrd v. Collins*, the Sixth Circuit,

discussing a federal habeas petitioner's claim of prosecutorial misconduct for improperly stating

a personal opinion concerning the credibility of witnesses during closing argument, explained,

> However, we lack supervisory power over state courts, and our inquiry on habeas review
> is limited to determining only whether the improper comments constitute a due process
> violation. *See Cook v. Bordenkircher*, 602 F.2d at 119 n. 5. As we noted earlier, in a due
> process analysis, we consider "the fairness of the trial, not the culpability of the
> prosecutor." *Pritchett*, 117 F.3d at 964 (quotation marks and citation omitted). We have
> not discovered, nor have the parties directed us, to any cases in which we have granted
> habeas relief on the basis of improper vouching.[43] The few cases in which vouching
> provided a basis for relief were in the context of a direct appeal where we exercise
> supervisory power over the federal trial court proceeding. Even on direct appeal,

however, reversal is not automatic. Compare *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir.1994) (finding reversible error), with *Collins*, 78 F.3d at 1039–40 (holding that improper vouching was harmless under the circumstances).

> [FN43] *See, e.g., Toney v. Anderson*, No. 96–4284, 1998 WL 68919 (6th Cir. Feb.13, 1998); *Martin v. Rivers*, No. 95–2210, 1997 WL 49067 (6th Cir. Feb.3, 1997), *cert. denied*, 520 U.S. 1233, 117 S.Ct. 1830, 137 L.Ed.2d 1036 (1997); *Boyle v. Brigano*, No. 93–3823, 1994 WL 242392 (6th Cir. June 2, 1994); *Cantrell v. Gray*, No. 84–3686, 1986 WL 16540 (6th Cir. Feb.7, 1986); *Mitchell v. Ravitz*, No. 85–1029, 1985 WL 13742 (6th Cir. Sept.30, 1985) (all cases denying habeas relief despite the petitioner's claim of improper vouching).

209 F. 3d 486, 537 (6th Cir. 2000); *see also Mattox v. Davis*, 549 F.Supp.2d 877, 923-925 (E.D.Mich. 2008) (discussing cases then stating, "[I]t is impossible to point to a Supreme Court decision that clearly establishes the principle that remarks of the prosecutor commenting on credibility violate the federal Due Process Clause.").  Wagner has not identified Supreme Court precedent that improper vouching by the prosecutor is a due process violation and the undersigned is not aware of such a case.  *See Woods v. Donald*, -- U.S. --, 135 S.Ct. 1372, 1377 (2015) (explaining that, because the Supreme Court had never decided the specific question in that case, the Sixth Circuit erred in finding that the state court of appeals' decision was contrary to a Supreme Court holding).

Here, as in *Byrd*, the prosecutor's statements during closing argument were brief, isolated comments.  209 F.3d at 538.  Defense counsel objected and the trial court struck the comments.  Doc. 8-7, pp. 154-156.  The prosecutor immediately thereafter told the jury that they, alone, decide the case.  Doc. 8-7, p. 156.  The trial court instructed the jury that the attorneys' opening and closing statements are not evidence, instructed the jury to disregard statements that the court had struck, Doc. 8-7, pp. 170-171, and instructed the jury that they are the sole judges of fact, credibility, and evidence, Doc. 8-7, p. 171.  Considering the totality of the circumstances, Wagner does not meet the "demanding standard" for habeas relief.  *Byrd*, 209 F.3d at 537-538 (considering the totality of the circumstances, the prosecutor's statements did not infect the trial

20

with unfairness; the trial judge instructed the jury that they had the sole discretion when

weighing testimony and the prosecutor's opinion as to that issue was not to be considered);

*White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state

court unreasonably applies [the Supreme] Court's precedent; it does not require state courts to

extend that precedent or license federal courts to treat the failure to do so as error.").  In short,

the Ohio Court of Appeals' rejection of Wagner's claim was not "so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fair-minded disagreement."  *Harrington*, 562 U.S. at 103.

In his Traverse, Wagner contends that the facts in his case are different from the facts in

*Darden*: in Wagner's case, unlike in *Darden*, the evidence was not "heavy with eyewitness and

circumstantial evidence" but was laden with impermissible hearsay and leading questions; the

defense did not have the last word on closing argument; and there were improper statements

made by the prosecutor (referencing items one through 10, *supra*).  But, as discussed below,

Wagner's trial was not laden with impermissible hearsay and leading questions.  The

prosecutor's remarks were improper but did not infect the trial with unfairness.  *See also Wilson*

*v. Mitchell*, 250 F.3d 388, 399 (6th Cir. 2001) ("This court has been reluctant to grant habeas

petitions based on improper prosecutorial statements at closing argument," finding that improper

statements by the prosecutor during closing arguments wherein the prosecutor vouched for a

witness' credibility and stated that the state met its burden of proof were improper but harmless).

And the fact that the defense did not have the last word on closing argument, as Wagner argues

in his Traverse (Doc. 12, p. 2), is not dispositive.  *See, e.g., Wilson v. Bell*, 368 Fed. App'x 627,

635 (6th Cir. 2010) (sexual assault case of a minor victim in which the prosecutor improperly

vouched for the credibility of witnesses in rebuttal closing argument; the state court's decision—

that the prosecutor's conduct was not sufficiently flagrant to warrant reversal—was not unreasonable).

### b. Item 10: prosecutor's references to jail

In item 10, Wagner argues that the prosecutor intentionally made the jury aware of prejudicial information—that Wagner had been in jail—while questioning a state's witness, therapist Spadaro.  Doc. 4, p. 9.  Wagner presented this issue to the Ohio Court of Appeals as part of his prosecutorial misconduct claim.  Doc. 8-1, pp. 334-338 (listing instances of alleged prosecutorial misconduct).  The Ohio Court of Appeals did not directly address the issue of the prosecutor's reference to Wagner being in jail in its decision; it did, however, consider Wagner's prosecutorial misconduct claim and reject it.  There is a presumption that AEDPA deference applies even when state courts do not discuss every claim separately.  *Harrington*, 562 U.S. at 98; *Johnson v. Williams*, 568 U.S. 289, 298 (2013).  Wagner has made no effort to rebut that presumption.

Wagner identifies two instances in which the prosecutor made references to his having been in jail.  In the first instance (Doc. 8-4, pp. 233-234), the prosecutor instructed Spadaro, when reading her notes, to "read everything except this, this sentence about him being in jail." Defense counsel did not object.  In the second instance, on redirect (Doc. 8-4, pp. 248-249), the prosecutor asked Spadaro what the victim meant when she said that Wagner could not get to her anymore and then stated, "technically speaking, her grandfather was in jail, right, and he got out; is that correct?"  Defense counsel objected.  The trial court had a lengthy discussion in a sidebar with counsel about whether defense counsel opened the door to that issue during cross examination (Doc. 8-4, pp. 249-259); the prosecutor agreed to reword the question; and defense counsel acquiesced to that solution and did not ask that the prior comment be stricken (Doc. 8-4, p. 259).  Beyond identifying these portions of the transcript, Wagner presents no argument

directed to the prosecutor's jail references and does not explain how such references resulted in a trial that was "so infected ... with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

The Ohio Court of Appeals' denial of Wagner's prosecutorial misconduct claim was not unreasonable. Given the serious nature of the charges in his case, it would not have surprised the jury to learn that Wagner had been briefly incarcerated prior to his trial. The first jail reference was likely inadvertent (and was not objected to); the second reference was not inadvertent but the prosecutor explained (during a lengthy sidebar with the trial court and opposing counsel that took up ten pages of the transcript (Doc. 8-4, pp. 248-259)), that she believed defense counsel had opened the door to the portion of the treatment note at issue that included a reference to the victim feeling better after having talked about feeling scared that Wagner had gotten out of jail. The confusion was due to a vague question asked by Wagner's counsel during cross examination and what portion of the treatment note his question referred to; the issue was resolved to the satisfaction of all by the prosecutor rephrasing her question. It cannot be said that these references so infected Wagner's trial with unfairness as to make his resulting conviction a denial of due process. *Darden*, 477 U.S. at 181.

### 4. The claim regarding leading questions fails on the merits

Wagner alleges that the prosecutor used leading questions when examining both minor victims, aged seven and eleven, at trial. Doc. 4, pp. 11-13. The Ohio Court of Appeals considered this claim:

*1. Leading Questions Posed to the Children*

{¶ 61} With respect to the children's testimony, Wagner complains that the prosecutor began her questioning by asking, "Okay. You have talked to me about your grandfather, right?" "Okay. When we talked, you told me he did some bad things to you." Wagner asserts that this was improper leading. Evid.R. 611(C) provides that leading questions may not be used on direct examination "except as may be necessary to develop" the

witness' testimony. The Ohio Supreme Court has recognized that "it is within the trial court's discretion to allow leading questions on direct examination." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 163, citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993). As such, the court has held that a prosecutor does not commit misconduct in engaging in "conduct that the trial court had discretion to allow and did allow." *Id.*

{¶ 62} This is especially true where the witness is a child of tender years. For instance, in *State v. Holt*, 17 Ohio St.2d 81, 83, 246 N.E.2d 365 (1969), the court emphasized that the trial court has broad discretion in allowing the state to use leading questions to develop the testimony of children who are the alleged victims of sexual offenses.

{¶ 63} Before L.M.'s exam began, Wagner's counsel approached the bench to express concern about the state's use of leading questions. It was acknowledged by all parties that it was within the trial court's discretion whether to allow leading questions. The court agreed to monitor the use of leading questions. During J.M.'s testimony, Wagner objected to only one leading question after J.M. indicated that she did not remember the last time her grandfather "did something bad" to her. The court sustained that objection. Wagner made no further objections. We find no abuse of discretion in the trial court allowing the state to ask leading questions, and after reviewing the testimony in its entirety, we do not find that the state's questioning rose to a level where it can be said that the state's attorney put "words," "concepts," and "allegations" in the children's mouths, as Wagner suggests she did.[FN1]

> [FN1] Wagner also complains that the trial court was going to allow the state to play the taped interviews of the children, which the state argued (in a sidebar) would bolster "the fact that the interview was properly done based on her training." However, the tapes were never played.

*Wagner*, 57 N.E. 2d at 123-124.

Wagner asserts, "[t]he effect of the leading question forced the jury to base its verdict not on the statements of the children who the state alleged that Petitioner raped, but rather on the words and beliefs of the prosecutor."  Doc. 4, p. 13.  The Ohio Court of Appeals disagreed.  It cannot be said that the Ohio Court of Appeals' decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 562 U.S. at 103; *see also Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005) (affirming denial of federal habeas petitioner's claim that the prosecutor's use of leading questions of rape victim was unconstitutional); *Glenn v. Warden*, *Ross Corr. Inst.*,

2013 WL 6578768, at *8 (S.D.Oh. Dec. 16, 2013) ("This Court is unaware of any United States Supreme Court precedent which holds that it is unconstitutional to ask leading questions on direct examination of the prosecution's witnesses.").

In sum, a portion of Ground 1 is procedurally defaulted and the remainder fails on the merits.

### B. A portion of Ground 2 is procedurally defaulted and the remainder fails on the merits

In Ground 2, Wagner argues that the trial court improperly admitted hearsay evidence when it allowed the state's witnesses to testify as to the victims' statements in violation of his due process rights.  Doc. 4, p. 13.

The Ohio Court of Appeals considered this claim,

{¶ 23} The Sixth Amendment's Confrontation Clause provides to an accused the right to be confronted with the witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Section 10, Article I of the Ohio Constitution provides similar rights. *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990). In *Crawford*, the U.S. Supreme Court considered whether the introduction of a hearsay statement violated a defendant's right to confront the witnesses against him. It held that the admission of out-of-court statements violates the Sixth Amendment when the statements "are testimonial and the defendant has had no opportunity to cross-examine the declarant." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 13, citing *Crawford* at 68, 124 S.Ct. 1354. Many cases since *Crawford* have examined when statements are "testimonial."

{¶ 24} While confrontation clause violations are avoided when the declarant is able to be cross-examined at trial, as was the case with both L.M. and J.M., it does not follow that an out-of-court statement is not hearsay simply because the declarant has testified at trial. *See State v. Sheppard*, 164 Ohio App.3d 372, 2005-Ohio-6065, 842 N.E.2d 561, ¶ 31 (5th Dist.), quoting *Crawford* at 59, 124 S.Ct. 1354, fn. 9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). Hearsay, by definition, is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Its admission is generally barred unless it falls within an exception set forth in Evid.R. 803, 804, or 807. The exceptions in Evid.R. 804 and 807 apply only where the declarant is unavailable to testify at trial. Because both victims testified at trial, neither of those rules provides a basis for admitting their out-of-court statements. We must determine, therefore, whether the victims' out-of-court statements were properly admitted under one of the Evid.R. 803 exclusions. The state contends that the statements were admissible under Evid.R. 803(4).

{¶ 25} Evid.R. 803(4) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{¶ 26} We examine the witnesses' testimony and the statements at issue to determine whether they were admissible under Evid.R. 803(4) or any other exclusion.

### 1. Rebecca Boger

{¶ 27} Boger testified that as an intake investigator, her job is to investigate allegations of abuse or neglect, to ensure that the child is safe, and then to refer the family for any services they may need. Boger interviewed L.M. and J.M. at Michael's House on February 13, 2013. Michael's House is a child advocacy center that was developed in 2005. Boger described it as a neutral, comfortable place to interview children "so they don't have to go to the police department or to our agency." Michael's House has audio and video recording capabilities. Boger recorded her interviews of L.M. and J.M.

{¶ 28} Boger characterized her interview of L.M. and J.M. as "forensic." She testified that she conducts her interviews in accordance with Beyond the Silence protocol developed by the state of Ohio. She said that she was trained not to use suggestive techniques or to ask leading questions and that she tries to get correct information in as non-traumatic a way as possible. Boger explained that she receives a case when someone calls the agency with a concern. What she does next is determined on a case-by-case basis. With some children, the child is at immediate risk of harm and it is her job to make sure that the child is safe from the perpetrator. Once she deems that the child is safe, if it is a criminal matter, her job is to contact law enforcement so they can assist in the case.

{¶ 29} Boger interviewed L.M. and J.M. separately with no one else present in the room. Before the interview, Boger had been told that there were allegations of inappropriate touching, but she said that the girls disclosed "much, much more than that" and that the girls' parents had not known the extent of what was revealed during their interviews. Boger referred the family to the NORD Center in Lorain so the girls could be examined by a SANE nurse.

{¶ 30} Boger responded to questions on cross-examination about the difference between a forensic interview and a therapeutic interview. She agreed that in a forensic interview, she tries to obtain as much information as she can about what may have occurred, and she attempts to do so in a neutral manner without influencing the statement. In a therapeutic

interview, the interviewer takes the position that what has been reported is true and works to treat the patient.

{¶ 31} On cross-examination, defense counsel asked Boger specific questions about what L.M. and J.M. told her. In response to these questions, Boger testified that J.M. told her that Wagner scratched her, that J.M. didn't talk to L.M. about what happened, that Wagner made her bleed, that Wagner abused her every time she went over to his house, and that Wagner told her not to tell anyone but she told because she wanted to make the right choice. Defense counsel elicited from Boger that L.M. never told her she had been forced to perform oral sex or that Wagner had stuck his finger inside of her. She confirmed that L.M. had told her that Wagner stuck his penis inside of her, that it happened every time she stayed the night at her grandparents' house except for the last time, and that when it happened, Wagner was on top of her.

{¶ 32} Wagner claims that Boger should not have been permitted to testify as to the girls' statements because she interviewed the children for forensic or investigative purposes. To be sure, Boger clearly described her interviews as "forensic." Ordinarily, this would mean that a majority of the statements made to Boger would not qualify as statements made for medical diagnosis or treatment under Evid.R. 803(4) and, therefore, would be inadmissible. *See, e.g., State v. Woods*, 8th Dist. Cuyahoga No. 82789, 2004-Ohio-2700, 2004 WL 1172077, ¶ 15 (explaining that where a social worker's function does not include diagnosis or treatment, statements made to the social worker are not admissible under Evid.R. 803(4)). The problem with Wagner's position here, however, is that it was Wagner's counsel who elicited those statements from Boger—not the state. For example:

> [Defense counsel]: * * * [I]sn't it true that [J.S.] said that Mr. Wagner scratched her?
>
> * * *
>
> [Defense counsel]: And she also talked about when Mr. Wagner allegedly did these things to her she was bleeding?
>
> * * *
>
> [Defense counsel]: And she said it happened every time. That she was bleeding?

{¶ 33} This is, therefore, an issue of invited error. "Under the invited-error doctrine, a party will not be permitted to take advantage of an error that he himself invited or induced the trial court to make." (Internal citations and quotations omitted.) *State ex rel. Mason v. Griffin*, 90 Ohio St.3d 299, 303, 737 N.E.2d 958 (2000). Because defense counsel invited the error in the introduction of L.M. and J.M.'s statements through Boger's testimony, we find his second assignment of error not well-taken as it relates to Boger's testimony.

*2. Jacqueline Spadaro and Rebecca Dills*

{¶ 34} Spadaro and Dills are licensed mental health therapists who diagnose and treat mental and emotional disorders. Spadaro treated L.M. and Dills treated J.M. They spoke at length about their diagnoses of the girls and the factors they considered in arriving at their diagnoses. This included many references to details that the girls provided during their therapy sessions.

{¶ 35} For instance, Spadaro testified that L.M. told her that the abuse began when she was around age seven, occurred mostly at her grandfather's house, and happened every time she went over to her grandparents' house. L.M. told Spadaro that her grandfather would lock the door. She said neither of them had pants on, their private parts would touch, and sometimes his penis would go inside of her. She described that it hurt and he did not care because he did not stop. L.M. told Spadaro that after Wagner had sex with her, they would watch the movie "Goonies." She said that she had put her mouth on his penis and touched it with her hands. L.M. told Spadaro that her grandfather showed her pictures of naked girls on a stage. He told her he wanted to stick his penis in her vagina and would tell her that his penis missed her. L.M. said that her grandfather told her that if she had sex with him, he would give her tootsie rolls. She said she was scared and that her grandfather "squished" her by lying on top of her.

{¶ 36} L.M. told Spadaro about feelings of anxiety and fears of being judged by others. Spadaro described that L.M. would plug her ears if her sister talked about the abuse, she avoided her favorite movie because it made her think of her grandfather, and she did not like when her friends talked about their grandparents. Spadaro said that L.M. had flashbacks during the day, she experienced trouble sleeping at night, and she had angry outbursts.

{¶ 37} As part of her therapy, L.M. wrote a letter to her grandfather: "I remember you had sex with me and you hurt my private parts. I want to know why you touched me in the first place, among other things." She did not want to send the letter or share it with her parents.

{¶ 38} Spadaro confirmed that she conducted therapeutic interviews of L.M. and not forensic interviews. She said that based on her assessment of L.M., L.M. had been sexually abused and suffers from post-traumatic stress disorder.

{¶ 39} Dills testified that J.M. identified her abuser as "Papa." J.M. described to Dills that her grandfather yelled at her and told her to get into his bed. She said that he touched her in her lower parts, where her bathing suit would cover. J.M. explained that he would tell her to lie back when he touched her and if she did not, he would push her forehead back. J.M. said that once her grandfather kicked her and she kicked him back. When the abuse happened, her grandfather would lock the door. She wanted to run out, but did not want to hurt his feelings. J.M. said that her grandfather told her "it was the best stuff in the world" and told her not to tell a counselor or he would go to jail. J.M. finally told her parents because she did not feel good about it. J.M. told Dills that she did not want to think about it and did not want her to even say the name "Papa," and she questioned whether she had done the right thing telling her mother. They discussed how J.M. had told her sister before telling her mother.

{¶ 40} J.M. told Dills that she knew that Dills, her mom, and her dad believed her, but was sad because her grandmother did not believe her. She said that she could not talk to her sister because her sister does not want to talk about it. J.M. wanted her mom in the room during her session with Dills, but her mom asked to leave the room.

{¶ 41} Dills testified that based on her counseling of J.M., she would classify her as a child who has been sexually abused. Dills originally diagnosed J.M. with adjustment disorder with depressed mood. Eventually, Dills identified that J.M. suffers from PTSD. She described that when she first started treating J.M., she complained of stomach pains and headaches. She was crying at school and was having a hard time focusing. She was getting up in the middle of the night, having nightmares and thinking she saw her grandfather. She was wetting the bed.

{¶ 42} Wagner concedes that "some" of the statements admitted through Spadaro and Dills' testimony were properly admitted under Evid.R. 803(4). In fact, we find that all of the statements were properly admitted under that rule. L.M. and J.M. disclosed these details to their therapists in the context of seeking treatment. *See State v. McGovern*, 6th Dist. Erie No. E–08–066, 2010-Ohio-1361, 2010 WL 1223903, ¶ 37 (finding that statements made by child to mental health therapist were admissible under Evid.R. 803(4)). We find no error in the trial court's ruling with respect to allowing Spadaro and Dills to testify about the statements made by L.M. and J.M. during therapy.

### 3. Melinda Kuebler

{¶ 43} Kuebler is a certified sexual assault nurse examiner. She testified that she was the program manager for the sexual assault unit at NORD Center, an outpatient mental health facility. She described that victims of sexual assault come to the NORD Center for forensic medical evaluations and rape kits. She discussed the protocol they follow. Typically, they begin by getting demographic and contact information from the person who has brought the child there. They then talk with the child, usually with the SANE and the child advocate present, to ask questions and find out from the child why they are there. They ask the child whether they would like to have their parent or guardian present for the exam, and if they do, they bring the parent or guardian back in.

{¶ 44} The examination is a head-to-toe physical looking at all areas of the body, noting any injury and inquiring about the origin of the injury. They then examine the genitalia. The exam takes two-to-three hours from start to finish. If the child has made any statements, they pass that information along to law enforcement.

{¶ 45} Kuebler testified that on February 13, 2013, she met with L.M. and J.M. J.M. told Kuebler that her grandpa used his nails and fingers on her front and back. She said that she was not supposed to tell anyone, but it started hurting and she did not want to hurt any longer. J.M. refused to allow Kuebler to perform an examination. She said it had been awhile since she had seen her grandpa and she did not need to be looked at.

{¶ 46} L.M. told Kuebler that her grandfather started inappropriately touching her when she was seven years old. She told Kuebler that it hurt. She said it did not bleed but he put his front part in her front part and back part and he used his hands. L.M. told Kuebler she wanted him to stop. Kuebler performed a head-to-toe forensic medical exam on L.M. which included a vaginal exam and exam of her rectal area. She found no evidence of trauma. Kuebler determined that L.M.'s hymen was intact. She explained that it is not unusual for a sexual abuse victim's hymen to remain intact. The hymen does not cover the vagina and it can remain intact despite penetration. She did not perform a rape kit on L.M. because it had been three or four weeks since she last saw her grandfather.

{¶ 47} Kuebler referred to her exam as a "forensic medical examination," however she said that the information she obtains from the victims prior to the examination is strictly for medical purposes and that it assists her in performing her medical examination.

{¶ 48} We find that L.M. and J.M.'s statements provided information that aided in Kuebler's examination and treatment of the victims. They were, therefore, properly admitted under Evid.R. 803(4). *Compare State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, 2013 WL 1858929, ¶ 25–56 (finding that the victim's statements about how she met the defendant, and defendant's demeanor after the rape did not aid in any sort of diagnosis or medical treatment). We also find that applying a plain error standard, as we are required to do here because Wagner did not object to Kuebler's testimony about the victim's statements, the admission of these statements was not such that the outcome of the trial clearly would have been different absent the error.

*4. Corey Mook*

{¶ 49} Mook is an officer with the City of Sandusky Police Department. On February 11, 2013, he responded to the call from M.M. and T.M. reporting the abuse. He went to their home. He spoke with M.M. and T.M. first, then spoke individually with each of the girls with their parents present. He told them he heard there were some things that happened at their grandfather's house. The girls told him he had been touching them inappropriately. He asked J.M. where her grandfather had touched her and she pointed to her vaginal area. He asked how long it had been going on and she said it had been quite some time. He did not ask more specific questions. During his conversation with L.M., she indicated that her grandfather had touched both her vaginal area and her buttocks. He asked how long it had been happening, but does not remember the specific time frame other than that it had been going on for a while. The conversation lasted five to ten minutes and he did not ask for specific details.

{¶ 50} Wagner did not object to Mook's testimony, therefore, we review for plain error. Where an officer testifies as to out-of-court statements in order to explain his or her conduct in an investigation, courts often find the statements to be non-hearsay because they are not being offered for the truth of the matter asserted. *See State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 20–24. This does not seem to be the context for offering the girls' statements through Mook. Also, it cannot be argued that the statements made to Mook were made for medical purposes, therefore, Evid.R. 803(4) did not provide a basis for allowing Mook to testify as to the girls' statements. However,

Mook did not ask the girls for any details beyond the fact that the inappropriate touching had occurred, that Wagner had allegedly touched J.M.'s vaginal area and L.M.'s vaginal area and buttocks, and that it had been happening for a while. The girls had already testified to these facts in much greater detail, thus this was not the first time the jury heard these allegations. Mook provided no additional details. We, therefore, find that the outcome of the trial was not affected by the admission of these statements.

*5. T.M. and M.M.*

{¶ 51} T.M. testified that on February 9, 2013, J.M. told her: "I have to tell you something. * * * Your papa has been doing this to me * * *." T.M. asked her if she had told anyone else and she said she had told L.M., and that L.M. told he had been doing the same thing to her. T.M. approached L.M. and L.M. confirmed that her grandfather had been touching her. When T.M. asked where, L.M. pointed to "her front privates" and "her bottom."

{¶ 52} T.M. told her husband, M.M. T.M. and M.M. sat down with the girls and told them that the situation was very important and very serious. They asked the girls if they were sure they were telling the truth and they both said yes. T.M. and M.M. did not ask for any additional details.

{¶ 53} M.M. called the Sandusky police. When the officers came, one of them talked to the girls. He did not ask very many questions. They determined it was the wrong jurisdiction and they needed to call the Erie County sheriff. The sheriff's office sent an officer over to talk to the girls. An interview was set up with ODJFS on February 13, 2013. Each child was interviewed separately by Boger. T.M. said that she did not know what the girls were going to say because she did not ask them any details—she said she did not want to know. After the interview, Boger came out to talk to them and she said it was worse than they thought. She said Wagner would make L.M. watch sex tapes then make her do what they saw in the tapes, which included having sex with her. This was the first time T.M. or M.M. had heard this.

{¶ 54} T.M. testified that she is the one who washes the kids' clothes, but she never saw blood on her daughters' underwear or anything unusual on their clothing. T.M. said she had taken the girls to her parents' house on February 9, 2013, to give her dad a birthday gift. J.M. was holding her stomach saying she did not feel good. Wagner also said he did not feel well and did not want to get the kids sick, so they just dropped off the present and she took the kids home. The girls did not go in the house.

{¶ 55} Although both T.M. and M.M. testified that Boger told them it was worse than they thought and that Wagner had been having sex with L.M., Wagner failed to object the first time T.M. testified to this, and he failed to object when M.M. testified to this. Because he failed to object, we again review for plain error. We find that the admission of these statements did not affect the outcome of the trial. This is especially true given that Boger herself had already testified that what the girls had told her was "much, much worse" than what their parents originally believed.

{¶ 56} Finally, Wagner argues that the improper admission of multiple hearsay statements caused prejudice by duplicating testimony. Because we have found that the admission of out-of-court statements was either not improper or was harmless, we find no merit to this contention.

{¶ 57} We find Wagner's second assignment of error not well-taken.

*Wagner*, 57 N.E. 3d at 117-123.

Wagner argues that the alleged hearsay statements were harmful because they came from authority figures such as investigators, counselors and a police officer. Doc, 4, p. 17; Doc. 12, pp. 5-6.  He also asserts that Ohio R. Evid. 807(A) requires a ten-day notice period and it was not complied with.  Doc. 12, p. 5.  For the reasons explained more fully below, a portion of Ground 2 is procedurally defaulted and the remainder fails on the merits.

### 1. Wagner's claims regarding the testimony of Boger, Kuebler, Mook, and the victims' parents are procedurally defaulted

The Ohio Court of Appeals observed that Wagner did not object at trial to the testimony of Officer Mook, Nurse Keubler, or the victims' parents and applied plain error review to his challenges of these witnesses' testimony.  It remarked that Wagner's own counsel elicited the statements from Investigator Boger that Wagner complained of on appeal and applied the invited error doctrine to foreclose relief to Wagner as to the testimony of Boger.  In both instances, the Ohio Court of Appeals applied a regularly used state procedural bar that forecloses federal habeas review.  *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) (Ohio Court of Appeals' application of Ohio's contemporaneous objection rule is an adequate and independent state ground that bars federal habeas relief); *Grant v. Brigano*, 2007 WL 2782742, at *7 (S.D.Ohio Sept. 24, 2007) (invited error doctrine applied by the Ohio Court of Appeals results in the claim being procedurally defaulted upon federal habeas review); *Fields v. Bagley*, 275 F.3d 478 (6th Cir. 2001).

Wagner does not allege cause to excuse his procedural default.  He did not raise an ineffective assistance of trial counsel claim on direct appeal or bring a Rule 26(B) Application for Reopening based on ineffective assistance of appellate counsel for failing to raise an ineffective assistance of trial counsel claim.  Moreover, Wagner does not demonstrate prejudice; he merely recites that permitting the officer's testimony was "plain error" (Doc. 12, p. 6) but does not show how the outcome at trial would have been different had the jury not heard the police officer's cumulative and non-specific testimony regarding the victims' statements.  Finally, Wagner does not show actual innocence.  His claims regarding the testimony of Boger, Kuebler, Mook, and the victims' parents are procedurally defaulted.

### 2. Wagner's claims regarding the testimony of Spadaro and Dills fail on the merits

The Ohio Court of Appeals observed that Wagner conceded that some of the statements admitted through the testimony of Spadaro and Dills were properly admitted under Ohio Rule of Evidence 803(4) because they were statements made to mental health therapists for purposes of the victims' medical treatment and it further found that all the statements admitted through Spadaro's and Dills's testimony were properly admitted under Evid.R. 803(4).

Wagner argues that the trial court's decision to allow the evidence was improper because, per Evid. R. 807(A)(1)(4), notice to a defendant is required ten days before the witness is to testify and it is "undisputed this was not done."  Doc. 4, p. 14; Doc. 12, p. 5.  But the victims' testimony was not admitted pursuant to Evid.R. 807.  As the Ohio Court of Appeals explained,

> {¶ 20} We first address Wagner's argument that the admission of the children's out-of-court statements violated Evid.R. 807(A)(4) because the state failed to give ten days' notice of its intent to use such statements. We observed in *State v. Lugli*, 6th Dist. No. Erie No. E–95–025, 1996 WL 493178, *8 (Aug. 30, 1996) that where a child is "found to be competent to testify and did testify at the trial below * * *, Evid.R. 807 does not control the admissibility of the evidence at issue." *Id.*, citing Evid.R. 807(A)(2). Evid.R. 807 is inapplicable here because both children testified.

*Wagner*, 57 N.E.3d at 117.  Beyond stating that the trial court's decision to allow the evidence denied him due process and was fundamentally unfair (Doc. 12, p. 5), Wagner does not specifically challenge the Ohio Court of Appeals' decision.  Moreover, a challenge to an Ohio court's interpretation of Ohio evidentiary rules is not cognizable on federal habeas corpus review.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (federal habeas court assumes that the Ohio court's interpretation of Ohio's rules of evidence was correct; a challenge to the Ohio court's ruling based on state law is not cognizable).

Wagner generally complains that testimony from counselors is harmful because they are authority figures.  Doc. 4, p. 17.  But he cites no legal authority for his apparent assertion that testimony by a counselor admitted under Ohio evidentiary rules violates a defendant's constitutional rights.  It cannot be said that the Ohio Court of Appeals' decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 562 U.S. at 103.

### C. Ground 3 is not cognizable

In Ground 3, Wagner argues that his convictions were against the manifest weight of the evidence and that the record demonstrates that he is actually innocent.  Doc. 4, p. 17.

 Wagner's claim that his convictions are against the manifest weight of the evidence is not cognizable because federal habeas corpus relief is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 US 1, 5 (2010).  A claim that a conviction is against the manifest weight of the evidence rests solely on state law and is not a cognizable claim in a federal habeas petition.  *See Ross v. Pineda*, 2011 WL 1337102, at *3

(S.D.Ohio April 11, 2011) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law," citing *State v. Thompkins*, 678 N.E.2d 541 (Ohio 1997)).

Wagner's claim of actual innocence is likewise not cognizable.  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010); *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007).  Moreover, Wagner concedes that he has no new evidence.  Doc. 4, p. 25.  His purported due process claim based on actual innocence is not cognizable.

### IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Wagner's Amended Petition (Doc. 4) be **dismissed in part** and **denied in part**.

Dated: May 2, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).